IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID KARRIGAN,<br><br>    Plaintiff,<br><br>   v.<br><br>DATAX, a Limited Liability Nevada Company; and SELLING SOURCE, LLC, a Delaware Limited Liability Company<br><br>    Defendants.<br>_____/ | No. C 13-2995 SI<br><br>**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |

Defendants' motion for summary judgment is scheduled for a hearing on May 30, 2014. Pursuant to Local Civil Rule 7-1(b), the Court determines that the matter is appropriate for resolution without oral argument, and VACATES the hearing. For the reasons set forth below, the Court GRANTS defendants' motion.

**BACKGROUND**

On June 28, 2013, plaintiff David Karrigan filed this lawsuit against defendants DataX and Selling Source, LLC. Plaintiff filed an amended complaint on October 11, 2013. The first amended complaint alleges that defendants are "consumer reporting agencies" under the Fair Credit Reporting Act ("FCRA), 15 U.S.C. § 1681 *et seq.*, and that defendants furnished consumer credit reports about plaintiff to third parties under impermissible circumstances in violation of the FCRA. Plaintiff alleges

that as a result of defendants' violation of the FCRA, he was the victim of a "massive financial scam . . . perpetrated against persons in the United States who had applied for and/or obtained payday loans." First Amended Complaint ("FAC") ¶ 26.

The facts regarding the scam are as follows. In June 2011, plaintiff went to a public library in Los Angeles, California and used a library computer to apply for three "payday" loans[1] on the internet, using websites called "Speedy Cash," "US Cash Advance," and "American Payday Advance." Kleine Decl., Ex. 1 at 59:25-15. Plaintiff entered his name, social security number, bank account number, phone number, and other personal information into an online application on each of the three websites. *Id.* at 63:15-64:8. Plaintiff obtained a $250 payday loan from Speedy Cash. Karrigan Decl. ¶¶ 2-4. Plaintiff defaulted on the loan in July 2011. FAC ¶ 22.

On January 13, 2012, plaintiff received a phone call on his mobile phone from a man who spoke with a thick Indian accent. Karrigan Decl. ¶ 7. The man told plaintiff that plaintiff was the "prime suspect" in a criminal case for failure to repay a payday loan, that plaintiff owed a debt of $500, and that plaintiff would go to jail if he failed to repay the loan right away. *Id.* ¶¶ 7-8. Plaintiff states that during the conversation he had with the caller on January 13, 2012, the caller recited the following personal information about plaintiff: his name, phone number, address, date of birth, e-mail address, employment history, checking account number, and the fact that plaintiff had recently defaulted on a payday loan. *Id.* ¶ 10. According to plaintiff, he had a number of conversations over the next week or so with people who he believed to be debt collectors. *Id.* ¶ 12. On January 20, 2012, the "debt collector" with whom plaintiff spoke told plaintiff that the collector's supervisor was in chambers with a judge, and the judge was about to sign a warrant for plaintiff's arrest. *Id.* ¶ 13. Plaintiff states that he believed his arrest was imminent, and so he spoke to his father about borrowing $500 to pay the "debt collector." *Id.* ¶ 14. Plaintiff's father agreed to loan him $500, and plaintiff agreed to pay him back as soon as he had the funds to do so. *Id.* ¶ 15. On January 20, 2012, as instructed by the "debt collector" with whom plaintiff spoke, plaintiff purchased a $500 prepaid debit card from Walmart, and he gave the number on the card to the "debt collector." *Id.* ¶ 16.

---

[1] The FAC alleges that "Payday loans are characterized by the short window of time before they are required to be repaid (usually one to two weeks), and their ridiculously high interest rates (as much as 911%)." FAC ¶ 16.

2

Plaintiff alleges "[i]n truth, however, Plaintiff owed no such debt, and was simply one of many victims of a scam that was perpetrated as the result of the scam operators' acquisition of consumer reports and personal information from Defendants." FAC ¶ 40. Plaintiff alleges that "[t]he scam operators succeeded in convincing thousands of payday loan applicants to pay them over $5 million dollars before being enjoined by a court order obtained by the Federal Trade Commission." *Id*. ¶ 36. Plaintiff has submitted evidence regarding an investigation by the Federal Trade Commission into a debt collection scam involving Broadway Global Master, Inc., In-Arabia Solutions, Inc., and Kirit Patel. Plaintiff has filed an excerpt of the declaration of Raminder Sabhi, which was filed in *Federal Trade Commission v. Broadway Global Master, Inc.*, Case No. 2:12-cv-008855 (E.D. Cal.). Plaintiff's Request for Judicial Notice, Ex. I.[2] The Sabhi declaration states, *inter alia*, that the FTC conducted an investigation of a debt collection scam involving phone calls to over 600,000 unique phone numbers, and that the FTC believed the scam was operated from India. Plaintiff assumes that he was a victim of same debt collection scam investigated by the FTC because the "debt collector" he spoke to had an Indian accent.

Plaintiff alleges that defendants sold a consumer report about plaintiff to the perpetrators of the scam. On July 14, 2011, Tiger Financial, d/b/a Speedy Cash, reported to DataX that plaintiff had defaulted on the loan. Tillman Decl. ¶ 14(d). The parties agree that DataX is a "consumer reporting agency" within the meaning of the FCRA. DataX is a wholly owned subsidiary of defendant Selling Source, LLC. According to Jessica Tillman, Vice President of Product and Compliance at DataX, "[DataX] prepares 'consumer reports' reflecting consumers' loan payment histories that it provides to customers with a permissible purpose to obtain a credit report, including lenders that make loans to consumers for such lenders' use in determining whether to extend credit to the consumer." *Id*. ¶ 4.

Between July 14, 2011, and January 19, 2012, DataX sold a consumer report about plaintiff that included information about the Speedy Cash default to two entities: AALM and American Web Loan. *Id*. ¶ 10. Defendants have submitted uncontroverted evidence showing that AALM and American Web Loan were both "credentialed customers" with whom DataX had contracts. *Id*. ¶¶ 5-8, 11, 12. According to the Tillman declaration:

---

[2] The Court GRANTS plaintiff's request for judicial notice.

3

5. DataX does not sell "consumer reports" to the public at large. It sells its reports only to credentialed customers with whom it has executed contracts. At any given time, DataX has fewer than 100 customers to whom it is selling "consumer reports."

6. Because the FCRA requires consumer reporting agencies to provide "consumer reports" only to those users it reasonably believes to have a permitted purpose for using such reports, and to verify the identity of new prospective users, DataX employs and performs a standardized credentialing policy and process to vet prospective customers. DataX's procedures include, but are not limited to, the following: Before establishing an account for a prospective purchaser of "consumer reports," DataX requires an explanation of the prospective customer's permissible purpose for using "consumer reports," collects a business license or articles of incorporation from the prospective customer, verifies that the phone number supplied by the applicant is associated with the prospective customer, screens for Patriot Act compliance (OFAC), and engages a third party vendor to conduct an onsite inspection of the prospective customer's place of business to accomplish two main objectives which are: (1) verifying that the company is a bona fide business and that the location, equipment, and general environment are in line with the type of business and stated permissible purpose on the client's application and (2) verifying that the offices and facilities are secure with regards to consumer data. This would include, but not be limited to, measures such as having a security guard on duty, locking filing cabinets, password protected computers, and ensuring that the general public or prospective client customers would not be able to access consumer reports.

7. If a prospective purchaser of "consumer reports" passes the credentialing process, it must execute a written contract with DataX governing such purchases before DataX will supply it with any "consumer reports." DataX's written contracts with its customers limit the purposes for which the customers may procure consumer reports, and contain a certification from the customer that the customer has an FCRA "permissible purpose" for obtaining each consumer report procured under the contract.

8. The FCRA also requires "consumer reporting agencies" to maintain records for each consumer on whom it has furnished a "consumer report" that identify the users to which such "consumer report" was provided ("inquiries"). DataX thus, in the regular course of its business, captures records of "consumer report" delivery, and maintains retrievable records from which it can determine to which entities it furnished a report regarding any specific consumer. The system architecture of DataX's databases is such that it is impossible to generate a "consumer report" from the database without creating a record that such a report was generated and to whom it was supplied. DataX relies on its records of "inquiries" when it prepares for consumers "full file disclosures," reports that consumers may periodically request from consumer reporting agencies.

*Id*. ¶¶ 5-8.

With regard to the report DataX sold to AALM, Tillman states,

> When DataX sold a report on Mr. Karrigan to AALM on December 5, 2001, DataX had reason to believe that AALM intended to use the report for a permissible purpose:
>
> a. DataX's due diligence on AALM, conducted November 9, 2009, indicated that AALM is a short term lender;

4

      b.    AALM represented in its agreement with DataX that it is a short term lender; would only use consumer reports for FCRA permissible purposes and the stated permissible purpose was to qualify applicants for short term loans-lending decisioning;

      c.    DataX conducted post-contract audits of AALM, including requiring a new agreement and credentialing update on January 12, 2012; and Office of Foreign Asset Control verifications on January 12, 2012, January 17, 2013, and January 30, 2014[; and]

      d.    after procuring [a] consumer report on Karrigan, AALM reported to DataX that it had denied the loan application of Karrigan.

*Id.* ¶ 11.

      With regard to the report DataX sold to American Web Loan, Tillman states,

      a.    DataX's due diligence on American Web Loan, conducted May 11, 2010, indicated that American Web Loan is a loan servicing company;

      b.    American Web Loan represented in its agreement with DataX that it is a loan servicing company; would only use consumer reports for FCRA permissible purposes and the stated permissible purpose was to verify information provided on loan applications; and

      c.    DataX requested and received an updated agreement on December 22, 2011.

*Id.* ¶ 12. Plaintiff's opposition to defendants' motion for summary judgment does not contend that AALM or American Web Loan were connected to the debt collection scam, and indeed plaintiff's opposition effectively abandons any claim that DataX sold a consumer report about plaintiff to the operators of the debt collection scam.[3]

    Instead, plaintiff now contends that Selling Source, LLC – possibly through its wholly-owned subsidiary PartnerWeekly – sold "sales leads" (which plaintiff equates with "consumer reports") to the scam operators. In support of this assertion, plaintiff has submitted a screen shot of Selling Source's website, a screen shot of Selling Source's profile page from the website LinkedIn, and several pleadings from *Selling Source, LLC v. Red River Ventures, LLC*, Case No. 2:09-cv-01491 (D. Nev.). The screen shot of Selling Source's website states,

    Selling Source, one of the largest privately-held digital marketing companies in the United States, provides customer acquisition and data services. The company

---

[3] As discussed *infra*, plaintiff asserts that Selling Source, LLC and DataX are parts of a "common enterprise" and should be treated as one entity. However, plaintiff's opposition does not argue that DataX itself sold a consumer report about plaintiff to the debt collection scammers.

5

> operates proprietary, scalable technology platforms to cost effectively deliver a substantial volume of precisely targeted, real-time sales leads while maximizing return on investment for advertisers and publishers.

Emanuel Decl., Ex. A.

The LinkedIn profile page states,

> Selling Source LLC is the parent company of an integrated group of online advertising, lead generation and data businesses. For more than ten years, Selling Source has pioneered online marketing strategies for specialty finance companies and now serves customers in more than one dozen industry sectors. London Bay Capital, a private equity firm based in San Francisco, acquired a controlling interest in Selling Source in December 2007.
>
> **Specialties**
> Lead Generation, Affiliate Marketing, Online Marketing, Credit Reporting, Identity Verification, List Management, Advertising Agency, CPA network, Email Provider, Lead Generation Network, List Management, Direct Marketing, Data Licensing

*Id.*, Ex. B.

Finally, plaintiff relies on the complaint and a declaration filed in *Selling Source, LLC v. Red River Ventures, LLC*, Case No. 2:09-cv-01491 (D. Nev.). Plaintiff quotes the following paragraphs from the complaint in that case:

> 20. Selling Source is a "lead" marketing data source, and is a leader in consumer speciality finance lead generation. As pertinent to this action, a "lead" is information of a complete nature that allows (for example) a short-term loan provider the information to contact a consumer who is interested in or seeking a short-term loan.
> 21. The main focus of Selling Source's business is the generation of leads through targeted advertising (including the accumulation of information from the internet), and the filtering, analysis, and organization of data to create valuable leads which will meet the requirements of Selling Source's customers. Selling Source's customers are providers of short-term loans. Selling Source is not itself a lender. Selling Source's customers instead contact consumers of short-term loan services directly, using lead information sold to them by Selling Source.

Plaintiff's Request for Judicial Notice, Ex. F.

Plaintiff also quotes from a 2009 declaration filed in *Selling Source, LLC v. Red River Ventures, LLC*, by Alton Irby in support of a motion for a temporary restraining order. *Id.*, Ex. G. Irby is a managing member of London Bay Capital, LLC, a private equity firm which owns a controlling interest in Selling Source. Plaintiff quotes the following paragraphs from Irby's 2009 declaration:

> 3. Selling Source is a technology, marketing and data company, which develops online marketing programs for its customers, most of whom are specialty lenders. Selling Source's principal product is a "consumer lead" which is essentially a compilation of data collected online, directly and consensually

6

> from a consumer who is applying for a loan or some other financial product. These consumer leads allows [sic] Selling Source's customers, who are primarily specialty lenders, to contact consumers seeking an online loan or other financial service, and the information in the consumer lead often forms the basis of the decision whether to provide a loan or other service to the consumer. Selling Source's primary business activity is the accumulation of information from the internet and other sources, and the filtering, analysis, and organization of the information in order to create highly valuable consumer leads to be sold by Selling Source to its customers, based on Selling Source's knowledge of its customers' requirements. Selling Source itself is not a lender. It is a marketing, technology and data company.

*Id.* Ex. G.

Defendants dispute that Selling Source sells consumer reports or sales leads. Defendants have submitted a new declaration from Mr. Irby, who states:

> 3. On August 11, 2009, I submitted a declaration in support of an *ex parte* motion for temporary restraining order and order to show cause filed by Selling Source in the matter *Selling Source, LLC v. Red River Ventures, LLC et al.*, No. 2:09-cv-01491-JCM-(GWF) (D. Nev. filed Aug. 11, 2009). The declaration is attached as Exhibit A. That action related to the Master Services Agreement ("Agreement") between The Selling Source, Inc. and one of its customers. Selling Source, LLC was formerly known as The Selling Source, Inc. That Agreement defined the "Company" as, collectively, The Selling Source, Inc. and its subsidiaries and affiliates. The Agreement provided that the "Company," collectively, was to provide various services pursuant to a series of related contracts between the customer and various subsidiaries of The Selling Source, Inc. The Agreement specifically refers to agreements between (1) the customer and (2) PartnerWeekly, LLC and DataX, each of which are, and were at the time I made the declaration in 2009, subsidiaries of Selling Source, LLC.
>
> 4. Accordingly, in my declaration, I refer to "Selling Source" to refer not only to Selling Source, LLC, but also to its subsidiaries and affiliates. In point of fact, different services are provided by different entities, as contemplated by the Agreement. Selling Source is, itself, merely the parent company of several companies engaged in online advertising, lead generation, and data businesses, including DataX and PartnerWeekly. Selling Source does not itself accumulate or analyze information about consumers or sell "consumer leads," or any other information about consumers, to third parties. Thus, when I stated in paragraph 3 of the August 2009 declaration that "Selling Source's principal product is a 'consumer lead' which is essentially a compilation of data collected online, directly and consensually from a consumer who is applying for a loan or some other financial product," and "[t]he consumer leads sold by Selling Source to its customers allow the customers, who are primarily specialty lenders, to contact consumers seeking an online loan or other financial service, and the information in the consumer lead often forms the basis of the decision whether to provide a loan or other service to the consumer," that was not intended to convey that Selling Source, LLC was the entity that compiled or sold consumer leads. Instead, at the time, that conduct was done by PartnerWeekly.

Irby Decl. ¶¶ 3-4. Attached as Exhibit A to the new Irby declaration is a complete copy of the 2009 Irby

7

declaration, including the original exhibits to that declaration. One of those original exhibits is the Master Agreement between Selling Source and its customer that Irby referenced in the 2009 declaration. *Id*., Ex. A at Ex. A. That Master Agreement defines the "Company" as The Selling Source, Inc. "together with its subsidiaries and affiliates." *Id*.

Defendants have also submitted the declaration of Glenn McKay, the President and CEO of Selling Source, as well as the declaration of Tim Madsen, the Executive Vice President of Sales for PartnerWeekly, LLC. McKay states that "Selling Source is the parent company of several companies engaged in online advertising, lead generation, and data businesses. Collectively, Selling Source's subsidiaries provide customer acquisition and data services. However, Selling Source does not itself sell any information about consumers to third parties." McKay Decl. ¶ 3.[4]

Madsen states that PartnerWeekly is a wholly-owned subsidiary of Selling Source, LLC, and that "PartnerWeekly is in the business of generating and selling leads for short term, unsecured small dollar loans." Madsen Decl. ¶¶ 3-4. Madsen states,

> 4. PartnerWeekly operates websites which make it possible for consumers to obtain access to such loans. Consumers who are interested in applying for such loans provide and submit information, through PartnerWeekly, to lenders who may be able to provide a short term loan to that consumer. The information includes identifying information, such as name, address, phone number, social security number, bank account information and a desired loan amount. The information provided by a consumer, and submitted to a lender, is referred to as a "lead." The "lead" consists of the information provided by the consumer, and no other information. Leads are presented to a lender electronically, in real-time and the lender notifies PartnerWeekly within seconds (via its electronic system) whether it "accepts" the lead for purchase or "rejects" the lead and will not purchase it. If a lender "rejects" the lead, it may be presented to another lender who, in turn, has several seconds in which to decide whether or not to "accept" the lead. If the lender accepts the lead for purchase, the consumer is redirected to the lender's website. Each lead is only sold one time to one lender. Once a lead has been rejected by a lender, a lender cannot access such lead data through the electronic system at a later date. Thus, information about any specific lead is only available to a lender for the few brief moments during which the lender evaluates the lead for purchase.

*Id*. ¶ 4. Madsen also states that "[t]he leads sold by PartnerWeekly to its lender customers do not

---

[4] This information is consistent with the LinkedIn profile page relied upon by plaintiff, which states that Selling Source LLC is the "parent company of integrated group of online advertising, lead generation and data businesses." Similarly, the Selling Source LLC website that plaintiff quotes states Selling Source "consist[s] of 11 affiliate companies . . . ." http://www.sellingsource.com/careers.php.

8

include any information about the consumer's payment history on prior loans; PartnerWeekly has no such information available to it." *Id*. ¶ 6. According to Madsen,

> 7. PartnerWeekly does not obtain data from DataX in its lead generation activities.
>
> 8. Leads generated by PartnerWeekly are sold exclusively by PartnerWeekly; i.e., PartnerWeekly does not transfer data to other entities, such as Selling Source, to permit those entities to sell the sales leads.
>
> 9. I have been informed that David Karrigan was victimized in January 2012 by someone who stated that he had an account with Bank of America and who claimed Mr. Karrigan had defaulted on a short term loan. Mr. Karrigan's counsel has suggested that the caller might have obtained this information about Mr. Karrigan from a "Selling Source" "lead." This is not possible. First, as explained above, Selling Source does not generate "leads" or otherwise sell "leads" to lenders; PartnerWeekly does. Second, even assuming for the sake of argument that a PartnerWeekly "lead" was a direct or indirect source of Plaintiff's information, it is wrong. Mr. Karrigan submitted information about himself to lenders through PartnerWeekly's electronic system in 2010. As previously mentioned, that information is only available to a lender in real-time, while the lender determines whether or not to purchase a lead. Thus, information submitted by Mr. Karrigan in 2010, would have only been available to a lender at the time Mr. Karrigan submitted it, and for the few brief moments the lender evaluated the lead for purchase. PartnerWeekly's "leads" have never included information about prior defaults on short terms loans, and PartnerWeekly has never had such information available to it. Even if PartnerWeekly did have such information, a lead regarding Mr. Karrigan could not, in 2010, have included information on a default that did not occur until 2011.

*Id*. ¶¶ 7-9.

### LEGAL STANDARD

Summary judgment is proper if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party, however, has no burden to disprove matters on which the non-moving party will have the burden of proof at trial. The moving party need only demonstrate to the Court that there is an absence of evidence to support the non-moving party's case. *Id.* at 325.

Once the moving party has met its burden, the burden shifts to the non-moving party to "set out 'specific facts showing a genuine issue for trial.'" *Id*. at 324 (quoting then-Fed. R. Civ. P. 56(e)). To

9

1   carry this burden, the non-moving party must "do more than simply show that there is some
2   metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,
3   475 U.S. 574, 586 (1986).  "The mere existence of a scintilla of evidence . . . will be insufficient; there
4   must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson v.*
5   *Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

6   In deciding a summary judgment motion, the court must view the evidence in the light most
7   favorable to the non-moving party and draw all justifiable inferences in its favor.  *Id*. at 255.
8   "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from
9   the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment."  *Id*.
10  However, conclusory, speculative testimony in affidavits and moving papers is insufficient to raise
11  genuine issues of fact and defeat summary judgment.  *Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d
12  730, 738 (9th Cir. 1979).  The evidence the parties present must be admissible. Fed. R. Civ. P. 56(c)(2).

## DISCUSSION

15  Defendants move for summary judgment on plaintiff's FCRA claim.  Defendants contend that
16  there is no evidence showing that either defendant sold a consumer report about plaintiff to anyone
17  connected to the debt collection scam. Defendants argue that the undisputed evidence shows that DataX
18  sold two consumer reports about plaintiff to entities in circumstances permitted by the FCRA, and that
19  Selling Source, LLC is not a "consumer reporting agency" under the FCRA and did not sell any
20  consumer reports about plaintiff to anyone.

21  The FCRA was adopted "to require that consumer reporting agencies adopt reasonable
22  procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other
23  information in a manner which is fair and equitable to the consumer, with regard to the confidentiality,
24  accuracy, relevancy, and proper utilization of such information . . . ." 15 U.S.C. § 1681(b). The FCRA
25  addresses the preparation and use of "consumer reports," a term defined in the Act. The Act defines
26  "consumer report" as,

27  > any written, oral, or other communication of any information by a consumer
    > reporting agency bearing on a consumer's credit worthiness, credit standing, credit
28  > capacity, character, general reputation, personal characteristics, or mode of living
    > which is used or expected to be used or collected in whole or in part for the purpose

10

of serving as a factor in establishing the consumer's eligibility for–

(A) credit or insurance to be used primarily for personal, family, or household purposes;

(B) employment purposes; or

(C) any other purpose authorized under section 1681b of this title.

15 U.S.C. § 1681a(d)(1).

According to the FCRA, "[t]he term 'consumer reporting agency' means any person which, for monetary fees, dues or on a cooperative nonprofit basis, regularly engages in whole or in part in the practice of assembling or evaluating consumer credit information or other information on consumers for the purpose of furnishing consumer reports to third parties, and which uses any means or facility of interstate commerce for the purpose of preparing or furnishing consumer reports." 15 U.S.C. § 1681a(f). A consumer reporting agency may only furnish a consumer report for enumerated "permissible" purposes. 15 U.S.C. § 1681b. A consumer reporting agency is permitted to furnish a "consumer report" to "a person which it has reason to believe . . . intends to use the information in connection with a credit transaction involving the consumer on whom the information is to be furnished and involving the extension of credit to . . . the consumer." 15 U.S.C. § 1681b(a)(3)(A).

Plaintiff's opposition does not address defendants' arguments or evidence regarding DataX. Instead, plaintiff devotes much of the opposition to arguing that DataX and Selling Source, LLC are a "common enterprise" and should be treated as the same company in this case. Plaintiff then argues that Selling Source, LLC is a consumer reporting agency, and that there is "ample evidence to support an inference that the scam operators who called Plaintiff on January 13, 2012, obtained his personal information from Selling Source." Opp'n at 17:15-17. Plaintiff contends that the evidence in support of this claim consists of the following: (1) the temporal proximity between when the "defendants" received plaintiff's personal information on July 14, 2011 and the January 13, 2012 phone call; (2) the scam operators had the same detailed information about plaintiff that was in defendants' possession (name, phone number, address, date of birth, e-mail address, employment history, checking account number, and fact that plaintiff had recently defaulted on a payday loan); (3) Selling Source is the "most likely source of the phone numbers of over 600,000 consumers" who were targeted in the debt collection scam investigated by the FTC because Selling Source "has a significant database of potential consumers

11

1  of short-term loan services," and the Court should infer that plaintiff was a victim of the same debt
2  collection scam investigated by the FTC; and (4) "the false statements made by Selling Source with
3  regard to the nature of its business activities shows consciousness of guilt and creates an inference of
4  culpability." *Id*. at 18-19.  Plaintiff asserts that Selling Source's discovery responses in this case – in
5  which Selling Source denied that it was a "consumer reporting agency" and stated that it did not sell a
6  consumer report about plaintiff to anyone – are demonstrably false because Selling Source stated that
7  it was in the lead generation business in the complaint and Irby declaration filed in *Selling Source, LLC*
8  *v. Red River Ventures, LLC*, Case No. 2:09-cv-01491 (D. Nev.).

9  The Court concludes that defendants are entitled to summary judgment because plaintiff has not
10 raised a triable issue of fact on the FCRA claim.  Plaintiff has not submitted any evidence showing that
11 either defendant furnished a consumer report about plaintiff to anyone connected to the debt collection
12 scam.[5]  Plaintiff does not dispute defendants' evidence regarding DataX's credentialing process, nor
13 does plaintiff dispute that the two entities to whom DataX sold a consumer report about plaintiff during
14 the relevant time period were credentialed customers of DataX.  The undisputed evidence shows that
15 DataX had "reason to believe" that the two entities "intend[ed] to use the information in connection with
16 a credit transaction involving the consumer on whom the information is to be furnished and involving
17 the extension of credit to . . . the consumer." 15 U.S.C. § 1681b(a)(3)(A).

18 With regard to Selling Source, LLC, the undisputed record shows that Selling Source is not a
19 consumer reporting agency and that Selling Source did not sell a consumer report or "sales lead" about
20 plaintiff to anyone.  The pleadings in *Selling Source, LLC v. Red River Ventures, LLC*, Case No. 2:09-
21 cv-01491 (D. Nev.), do not establish that Selling Source, LLC is a consumer reporting agency.  Instead,

---

[5] As such, it is irrelevant whether Selling Source, LLC and DataX are a "common enterprise" as asserted by plaintiff. In any event, the Court finds that plaintiff has not raised a triable issue of fact on this issue. Plaintiff has submitted evidence showing that Selling Source, LLC and DataX operate out of the same office suite and that Glenn McKay is the managing member and CEO of both companies. Plaintiff's Request for Judicial Notice, Ex. C-G. In response, defendants have submitted the Tillman and McKay declarations which state that Selling Source, LLC and DataX have strictly observed corporate formalities, including maintaining separate bank accounts from one another, documenting all financial transactions, using corporate assets solely for corporate business purposes, maintaining their own corporate books and records, and operating under their own financial plans. *See* McKay Decl. ¶ 6; Tillman Decl. ¶¶ 15, 16. In addition, contrary to plaintiff's assertion that both companies have the same owner, the evidence shows that DataX is a wholly owned subsidiary of Selling Source, LLC, and that a private equity investment firm has a controlling interest in Selling Source. *See* Tillman Decl. ¶ 4; McKay Decl. ¶ 3; Irby Decl. ¶ 2.

the pleadings in that case used the term "Selling Source" to refer to Selling Source (or its predecessor The Selling Source, Inc.) together with all of its subsidiaries. Irby Decl. ¶¶ 3-4 & Ex. A at Ex. A. The evidence submitted by defendants shows that DataX sells consumer reports, and that non-party PartnerWeekly, which is another Selling Source subsidiary, sells "sales leads." The Madsen declaration, which is undisputed, shows that the debt scam operators did not purchase plaintiff's information from PartnerWeekly because, *inter alia*, "sales leads" do not contain information about a consumer's prior loan defaults. Madsen Decl. ¶¶ 4-6, 9.[6]

In response to this undisputed evidence, plaintiff argues that the Court should make a number of "reasonable inferences" in order to connect defendants to the debt scam operators. However, to defeat summary judgment, plaintiff must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd.*, 475 U.S. at 586; *see also Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1065 n.10 (9th Cir. 2002) ("At summary judgment, this court need not draw all possible inferences in [plaintiff's] favor, but only all reasonable ones.") On this record, no reasonable jury could infer that either defendant provided a consumer report about plaintiff to the scam operators because there is no evidence in support of such a claim.

///

---

[6] Plaintiff's opposition argues that if the Court is inclined to grant defendants' motion, the Court should instead grant a continuance pursuant to Federal Rule of Civil Procedure 56(d) to permit plaintiff to conduct more discovery to obtain "[a] list of all persons or entities to whom Defendants and any of those various affiliated companies disclosed plaintiff's personal information." Opp'n at 21:9-11. Plaintiff asserts that defendants have "obstructed" the discovery process because Selling Source, LLC has provided false and misleading discovery responses, namely the responses stating that Selling Source, LLC is not a consumer reporting agency. For the reasons set forth in this order, plaintiff has not shown that Selling Source, LLC's discovery responses in this case were false or misleading. Both defendants have already provided the information requested with respect to DataX and Selling Source, LLC. Plaintiff appears to take issue with Selling Source's refusal in discovery to produce information from non-party PartnerWeekly. Plaintiff has not shown that Selling Source, LLC had any obligation to produce such discovery, and in any event, plaintiff has not shown that the discovery at issue would raise a triable issue of fact.

**CONCLUSION**

For the foregoing reasons, the Court GRANTS defendants' motion for summary judgment. Docket No. 29.

**IT IS SO ORDERED.**

Dated: May 29, 2014

SUSAN ILLSTON
UNITED STATES DISTRICT JUDGE